## INHABITANTS OF THE TOWN OF WARREN
### *vs.*
### SAMUEL E. NORWOOD.

Knox.    Opinion, December 20, 1941.

182

*Charles T. Smalley,* of Rockland, for plaintiff.

*Elisha W. Pike,* of Rockland, for defendant.

SITTING: THAXTER, HUDSON, MANSER, WORSTER, MURCHIE, JJ.

MURCHIE, J.   By writ of entry, the plaintiff town here seeks to assert a title claimed to have been acquired under the operation of Chapter 244 of the Public Laws of Maine, 1933, as amended. The tax, on which the lien sought to be enforced is based, was assessed against defendant as owner of the property in 1937. The lien certificate expired August 18, 1939. The writ, dated April 3, 1940, was served April 5, 1940.

The statute was designed, according to legislative pronouncement incorporated therein, to provide a method, additional to those already established, for the enforcement of liens on real estate created by the assessment of taxes pursuant to Section 3 of Chapter 13 of the Revised Statutes (1930). Since the enactment of the statute, it has been thrice amended. No particular amendment is of importance in the present cause, but each change shows intention on the part of the legislature to extend the operation of the Act and make it more workable. Thus in 1935 (Chapter 28) the original restriction against use of the method by collectors of taxes in plantations was eliminated; in 1937 (Chapter 136) provision was made that notices by registered mail should be sufficient for non-resident owners; and in 1939 (Chapter 85), with other changes tending to simplification and eliminating differences in process for resident and non-resident proprietors, provisions were made for cases where the record owner against whom a tax was assessed died

prior to demand, where assessment was against the heirs or devisees of a deceased person, and where assessment was against someone other than the record owner.

The case was heard by referees under a rule which reserved the right of exceptions on questions of law and is properly before the court under that reservation. The referees found for the plaintiff as to the first of two parcels described in the writ. Objections to the acceptance of their report were seasonably filed by the defendant, and the report having been accepted, the case comes forward with the seven stated grounds of objection urged as the exceptions.

The record discloses that the tax was assessed prior to May 8, 1937; that it was committed to the collector of taxes, by warrant dated that day; that notice in writing was left at the home of the defendant on February 2, 1938, which, while no copy was retained by the collector, must be assumed to have contained the necessary recitals, i.e. the amount of the tax, a description of the property, an allegation that a lien was claimed, and a demand for payment within ten days, since defendant made no denial thereof, and his counsel has not challenged its sufficiency; that a certificate, in appropriate form, was recorded in the proper registry office, on February 19, 1938; and that a true copy thereof was filed with the town treasurer the same day.

The sixth alleged exception challenges the validity of the tax assessment. This is considered first because unless the tax was properly assessed, there was no tax lien to enforce and no one of the questions raised by the additional exceptions can be considered as pending before us for determination.

The principle that strict compliance with statutory requirements is necessary to divest property owners of their titles for non-payment of taxes has become firmly established by a long line of decisions running back to one rendered by our first Chief Justice at the beginning of our statehood, *Porter* v. *Whitney*, 1 Me., 306. For later cases, see *Brown* v. *Veazie*, 25 Me., 359; *Hobbs* v. *Clements*, 32 Me., 67; *Bowler* v. *Brown*, 84 Me., 376,

24 A., 879; *Baker* v. *Webber*, 102 Me., 414, 67 A., 144. In these cases the issue was between an individual claiming as purchaser at a tax sale and the owner against whom the tax was assessed, or one claiming under him, but the same principle, notwithstanding the implication in *Bowler* v. *Brown*, supra, that it was particularly applicable to controversies "between the purchaser at a tax sale, and the original owner," has been recognized where the issue was between the municipality and the assessed owner, *Inhabitants of Williamsburg* v. *Lord*, 51 Me., 599; *Inhabitants of Orono* v. *Veazie*, 57 Me., 517; *City of Old Town* v. *Robbins*, 134 Me., 285, 186 A., 663, or between a purchaser from the municipality, after the expiration of the redemption period, and the grantee of such owner, *Van Woudenburg* v. *Valentine*, 136 Me., 209, 7 A., 2nd, 623.

Defendant is entitled to the benefit of this principle, reasonably applied to the facts of the instant case. The exact limits of such application have never been defined, but numerous decisions reject tax titles, some on the ground of irregularity or deficiency in procedure following assessment of the tax, *Porter* v. *Whitney*, supra; *Brown* v. *Veazie*, supra; *Hobbs* v. *Clements*, supra; *Van Woudenburg* v. *Valentine*, supra; and others for invalidity in the assessment itself, *Inhabitants of Williamsburg* v. *Lord*, supra; *Inhabitants of Orneville* v. *Palmer*, 79 Me., 472, 10 A., 451; *Bowler* v. *Brown*, supra.

Allegation of the exception is that,

> "The assessment . . . was null and void, in that there was no legal Board of Assessors."

In the brief of counsel, and in the oral argument, the sole ground urged for this claim was election, at annual town meeting, of three assessors, including one C. T. Moody, and later election, at special town meeting held twenty-six days later, of P. D. Starrett "to fill vacancy caused by the resignation of C. T. Moody," with no evidence to establish the fact of resignation. To quote the exact claim, assertion in the brief was,

> "I submit that four assessors, is not a legal Board, and

the assessment made by all or any three of them is invalid and null and void."

Intention must be to allege that a board of four is not a legal board when voters originally elect a board of three, since it is plain under our statutes, which have remained unchanged upon the point for more than one hundred years (R. S. 1930, Chap. 5, Sec. 12) following a change from the original provision of "three or five meet persons, to be Assessors" (Laws 1821, Chap. CXVI, Sec. 1), that a town may properly elect a board of four if it desires. Whether or not the majority of a board may legally assess taxes, a question raised in *Jordan* v. *Hopkins*, 85 Me., 159, 27 A., 91, but not decided because participation by a selectman who had not been sworn as an assessor was held to invalidate the assessment, it seems unnecessary to decide in this case, since no authority is offered for the claim that a vacancy by resignation must be proved. In *Gould* v. *Monroe*, 61 Me., 544, this court recognized a vacancy in the office of collector of taxes on the basis of the refusal of the elected official to serve without evidence of such refusal, and cited with approval a Massachusetts case to the same effect, *Hays* v. *Drake*, 6 Gray, 387.

Neither in his principal brief nor oral argument did counsel for defendant offer any foundation for this sixth exception other than the foregoing, but as a reply brief he refers the court to R. S. 1930, Chap. 5, Sec. 5, which establishes governance for town meetings by a declaration that warrants therefor shall state in distinct *articles* the business to be transacted thereat and that "no other business shall be there acted upon." The transcript of testimony contains excerpts from the town records showing that the qualified inhabitants of the plaintiff town met pursuant to a "foregoing warrant" on March 1, 1937, and again on March 27, 1937, and under listed *article* numbers elected three selectmen and three assessors, a tax collector and a town clerk, at the meeting of March 1, and a "first assessor to fill vacancy etc.," at the meeting of March 27.

The transcript discloses that a book which contained the town records was presented before the referees and examined by counsel for defendant; that thereafter the validity of the election of the assessors and the tax collector, the election of the clerk, and the election and qualification of P. D. Starrett as assessor were questioned, and issue was raised as to the eligibility of the treasurer, elected the following year; that excerpts showing the election of the designated officers in 1937 were read into the testimony at the request of defendant's counsel, who expressly stated that he raised no objection "as to other matters appearing in the records of the town meeting"; and that his cross-examination of the town clerk related only to the method of voting, the qualification of the officers, and the eligibility of the treasurer. Had the book failed to support the recital, "Pursuant to the foregoing warrant," with which the record of each meeting commenced, or shown that action taken under any *article* exceeded that authorized thereunder, very simple questioning in cross-examination would have terminated the case in favor of defendant before the referees. In the absence of evidence to the contrary, we think it must be assumed that all action taken at the meetings was properly taken under the warrants by which they were convened. Such assumption comes within the rule that in the absence of evidence to show the contrary, it will be presumed that a town has proceeded in the usual and legal manner, *Mussey* v. *White,* 3 Me., 290; *Blanchard* v. *Dow,* 32 Me., 557; *Hathaway* v. *Inhabitants of Addison,* 48 Me., 440; *Inhabitants of Wellington* v. *Inhabitants of Corinna,* 104 Me., 252, 71 A., 889. The decision of the referees imports findings that the elections were valid and that the oaths administered were sufficient to qualify the elected officers. There is competent evidence in the record to support such findings. There is no merit in the sixth exception.

The tax assessment being valid, it becomes necessary to determine the issues raised with reference to the description of the locus. Regardless of descriptive sufficiency, no title can be held to have passed to the plaintiff unless the statute repre-

sents a constitutional exercise of legislative power, but long and thoroughly established practice dictates that no question of constitutionality shall be passed upon except when entirely necessary to a decision of the cause in which it is raised. 11 A. J., 720; *Payne* v. *Graham,* 118 Me., 251, 107 A., 709, 7 A. L. R., 516.

As to the adequacy of the description, the defendant alleges four grounds of exception. He first challenges that used in the inventory and valuation, relying, apparently, on the condition stated in the statute that the alternative remedy provided for the enforcement of tax liens shall be available only "if the inventory and valuation carries a description sufficiently accurate to identify the real estate taxed," and on authorities which make it clear that it is the assessment of a tax which lays the foundation on which any subsequent proceedings looking to the enforcement of the lien which that tax creates must rest. This issue is fundamental. *Greene* v. *Lunt,* 58 Me., 518; *Burgess* v. *Robinson,* 95 Me., 120, 49 A., 606. It represents a requirement which even legislative action cannot waive. Blackwell on Tax Titles, Par. 223. The assessment shown in the present record describes the locus by the abutters at the cardinal compass points, recites the acreage, and values separately the land and the buildings thereon. The information carried in the description book clearly identifies *some* particular property, and there is no suggestion in the testimony of such facts as were held to control against a similar description in *Burgess* v. *Robinson,* supra, that it might be applicable equally to other property. The detail given goes far beyond the requirement of identification with reasonable certainty declared requisite in the texts, Blackwell on Tax Titles, Par. 223; 26 R. C. L., 357; and held sufficient in decided cases, *Greene* v. *Walker,* 63 Me., 311; *Greene* v. *Lunt,* supra. Defendant takes nothing by his first exception that "there is no description of the real estate in the inventory and valuation, sufficiently accurate to identify it."

The second, third and fifth exceptions may be considered to-

gether. As in the first, it is apparent that defendant placed little reliance upon them since they were submitted without comment, either by way of argument or the citation of authorities, upon the basis that "the record speaks for itself." It speaks as definitely with reference to the second, third and fifth exceptions as to the first. The second, which challenges the lack of "evidence aliunde" to explain a "vague, uncertain and indefinite" description in the assessment is meaningless since the description there used requires no outside support or interpretation. The third and fifth are based on the fact that the description used in the proceedings subsequent to assessment "did not follow" the former, in the case of the lien certificate, or was "dissimilar," in the plaintiff's inventory and "valuation," by which presumably was meant the declaration in the writ. Examination of the three descriptions used discloses that the abutters were everywhere named the same, but where the description recited in the assessment stated that the lot was bounded North, East, South and West by named individuals, the later ones described it as bounded by "land of" the same named individuals and ushered in the cardinal points in each case by the words "on the." These variations come clearly within the rule laid down in *Greene* v. *Lunt*, supra, that proceedings to enforce a tax lien will not fail for defective description although the locus declared on is described "somewhat differently" in the assessment and in the writ, if the descriptions used are definite and have so much in common "as to satisfactorily lead to the conclusion that both refer to the same tract."

Defendant's remaining exceptions are the fourth, that in the act under consideration a lien certificate is made a mortgage by express provision of law, and is invalid as such because "without seal," and the seventh, which challenges the constitutionality of the statute. The latter is subdivided into two parts, one alleging that "a lien claim is not a mortgage and cannot be made one by legislative fiat," and the other that the law does not meet the requirements of "due process" under the constitutions of the United States and of this State. While the "fiat"

claim was expressly waived by counsel in the statement of his brief,

> "On mature consideration, I am of the opinion that it is competent for the Legislature to create a Statute mortgage which abrogates the common law requirements, although I contend that Chapter 244 did not intend to abolish the common law requirement of a seal,"

it may still, as thus restricted, tie into the fourth exception, that sealing is essential to constitute a valid mortgage, and will be considered in connection therewith.

Quotation of the pertinent words of the statute would seem to be a complete answer to the doubt about legislative intention. The act requires two things subsequent to assessment of a tax, both of which must be performed within carefully limited time intervals. The collector must give *a notice in writing* to the taxpayer and he must record *a certificate* in the registry of deeds. The details to be stated in notice and certificate are carefully enumerated. The only recital as to the *form* of either is that the certificate shall be *signed* by the collector. Previous to the enactment of the statute now under consideration, a tax lien on real estate was enforced by a "tax sale" and title passed by deed. Provision for enforcement by deed undoubtedly required all the usual and regular formalities incident thereto, including a seal. The present provision for enforcement by recording such an informal instrument as a certificate clearly evidences intent that the formalities of a deed are not requisite. The language of the act shows that the legislature was conscious of mortgages, as well as of liens (based on taxes, or otherwise), of attachments, and of other possible encumbrances. Section 1 does not purport to create a new lien or encumbrance. It recognizes that a lien attaches by law to real property as the result of the assessment of a tax thereon and provides for the enforcement of that lien by the filing of a *signed* certificate, if the tax remains unpaid after a stated interval. There is no mention of a seal, or of acknowledgment. There is no require-

ment for the naming of parties, for the recital of any consideration, for habendum or testimonium clauses, or for delivery. Legislative declaration is that the filing of the certificate shall be deemed to create and shall create a mortgage.

Neither the designation "mortgage," used by the legislative draughtsman, nor that of "statute mortgage," used by counsel for the defendant, seems entirely appropriate to describe either what the instrument is, or what it is intended to accomplish. The word mortgage, by general acceptation for many years, has come to have an established meaning which connotes not merely the transfer of a title which is defeasible upon the performance of a condition stated in the instrument of transfer, but, ordinarily, one which results from the volition of the owner of the property which is made subject to its terms. Nevertheless this Court has heretofore recognized that a tax deed, which cannot be said to represent a voluntary conveyance on the part of the owner of the property described therein, is, in principle, a mortgage. *Watkins et al.* v. *Eaton et al.,* 30 Me., 529 at 535 (cited and quoted with approval in *Loomis et als.* v. *Pingree et als.,* 43 Me., 299). Tax deeds, it is true, carry recital in their terms that the title conveyed is subject to defeasance, but they are neither delivered nor recorded in the title registry office until after the expiration of the statutory redemption period, R. S. 1930, Chap. 14, Sec. 81. The certificate required to be used under the present law by those who seek thereunder to enforce the tax lien which attaches to real property to secure the payment of a duly assessed tax is, without doubt, a new legislative creation which has no counterpart in earlier law. Neither the novelty of a legal form nor the name assigned to it can serve to defeat the legislative intention which induced establishment of such a form, even though it be a misnomer, which is not entirely clear in the present case. Legislation must be tested not by nomenclature, but by the purpose it is designed to serve and determination as to whether or not the substance of the act comes within the ambit of legislative power or transcends legislative authority.

The purpose of the legislation is manifest if reference is made to the comment of Mr. Justice Emery, later Chief Justice, in *Bowler* v. *Brown,* supra, page 379:

"It is sometimes said that it is difficult to so assess a tax, and make a tax sale, as to pass a title to the purchaser. It should not be so. Every necessary step is named in the statute, and it is only necessary to have competent evidence that such steps were taken."

Inference from this statement is clear that when every act required by statute for the enforcement of a tax lien has been performed, title will pass. The acts required under the tax deed statute were numerous and varied. Those required under the new act are few and simple, and are designed to facilitate the passing of title to real estate in event of tax default. It remains to be considered whether it was competent for the legislature to provide for such passing without requiring the execution of a specialty and whether the enactment transcends constitutional inhibitions by a failure to provide due process.

At common law it was definitely established that title to realty could be conveyed only by instrument under seal, *Porter* v. *Read,* 19 Me., 363; *Manning* v. *Laboree,* 33 Me., 343; *Lovejoy* v. *Richardson,* 68 Me., 386; *Emerson* v. *Shores,* 95 Me., 237, 49 A., 1051, 85 Am. St. Rep., 404; *Brown* v. *Dickey,* 106 Me., 97, 75 A., 382; and that, to constitute a seal, there must be an impression — upon "wax" in earliest times, *Tasker* v. *Bartlett,* 5 Cush., 359; 4 Kent's Commentaries, 452 (9th Edition 526); and, later, upon "a wafer or other tenacious substance capable of being impressed," *McLaughlin* v. *Randall,* 66 Me., 226; *Bates* v. *Boston, etc. R. R. Co.,* 10 Allen, 251, and cases therein cited. The same requirement was applicable to corporate seals as to common seals, *Cram* v. *The Bangor House Proprietary,* 12 Me., 354; *Rangeley* v. *Spring,* 28 Me., 127; and to legal processes, such as warrants for arrest, *State* v. *Drake,* 36 Me., 366. That the strictness of the requirement might be changed by legislative enactment as to the particular

form which a seal should take has been assumed by the law-making body for many years, as will be noted by reference to the statutory provisions found in Paragraphs XVI and XVII of Section 6 of Chapter 1 (R. S. 1930), eliminating the requirement of wafer, wax or adhesive substance where a court seal is affixed or where instruments under seal are executed by a corporation, and legalizing for corporations the use of facsimile, engraved or printed seals. Legislative power to make such changes has long been asserted in many states — (See Kent's Commentaries, Vol. IV, 527, 9th Edition, and the footnote in *Commonwealth* v. *Griffith*, 2 Pick. 11, on page 17), and it seems to have been recognized by this Court in *Woodman* v. *York and Cumberland R. R. Co.*, 50 Me., 549; *McLaughlin* v. *Randall*, supra. A statement in the opinion in the last named case seems to carry recognition that the strict rules of the common law with reference to seals might well be changed by legislation:

"How far the law requiring a seal upon deeds and other instruments, may be liberalized or otherwise, by future course of decision, or *by legislative enactment*, (italics ours) . . . , we cannot now anticipate, . . . ."

The ancient reasoning which laid the foundation for the strict rule (quoted with approval in *Jewell* v. *Harding*, 72 Me., 124 at 126), that a "seal attracts attention, and excites caution in illiterate persons, and thereby operates as a security against fraud," is clearly inapplicable to documents intended to expedite the collection of taxes.

The distinction as to legislative power between that conferred under the Constitution of the United States, where only the particular powers enumerated are vested in the legislative department, and that possessed under state constitutions generally, and particularly that of this State, has been frequently declared, although phrased differently by courts and writers. This Court has heretofore recognized the broad scope of legislative power, *Sawyer* v. *Gilmore*, 109 Me., 169, 83 A., 673; *Opinion of Justices*, 132 Me., 519, 174 A., 845, which was

last expressed in the words that it is "absolute and all-embracing except as expressly or by necessary implication restricted by the Constitution," *Opinion of Justices*, 137 Me., 350; 19 A., 2d, 53. In Cooley's Constitutional Limitations (7th Edition, page 242, 8th Edition, page 355), it is stated that, when a state law is attacked on the ground of unconstitutionality,

"it is presumably valid in any case, and this presumption is a conclusive one, unless in the Constitution of the United States or of the State we are able to discover that it is prohibited. We look in the Constitution of the United States for *grants* of legislative power, but in the constitution of the State to ascertain if any *limitations* have been imposed upon the complete power with which the legislative department of the State was vested in its creation."

There being no limitation, stated or implied, in either constitution which prohibits legislation to abrogate common law requirements in respect thereto, we apprehend there can be no doubt of adequate authority in the legislative department of government to give a certificate the effect of enforcing a tax lien without requiring that it be executed by sealing.

All preliminary questions incident to the claim that plaintiff has acquired title to the locus by enforcement of a tax lien having been resolved in favor of such claim, it becomes necessary to consider the constitutional question raised by the seventh exception. That the legislative branch of government under our tripartite system is subject to restrictions upon its authority, created by constitutional provisions, and that it is one of the proper functions of this Court to define the limits of legislative power, are principles too generally recognized to require the citation of authorities. The yardstick to be applied cannot be better stated than in the words of Chancellor Kent (Commentaries, Vol. I, page 500, 9th Edition), that a law to be valid "must conform, in the first place, to the constitution of the United States, and then to the subordinate constitution" of the state, and that "if it infringes the provisions of either, it is so

far void." Steady obedience to "the requisitions of duty" require the Court, as aptly phrased by our first Chief Justice, to pronounce a statute which is "in violation of constitutional requirements or restraints" to be "unconstitutional and void," *Trustees New Gloucester School Fund* v. *Bradbury*, 11 Me., 118, at 126.

Those who act pursuant to a statute are not required to demonstrate that the provisions thereof are within legislative power. Rather it is for one who questions the validity of administrative acts on constitutional grounds to show that the particular enactment exceeds legislative power. Cooley's Constitutional Limitations, 7th Edition, 127, 8th Edition, 177. Necessarily, as this Court has heretofore declared in a case involving the identical statute now under consideration, he who raises the question must show that the act complained of "affects him injuriously, and actually deprives him of a constitutional right," *Inhabitants of Canton* v. *Livermore Falls Trust Co.*, 136 Me., 103 at 107, 3 A., 2d, 429, 431, and cases therein cited. That this defendant is "affected" is patent since it is his property which is claimed to have been taken pursuant to the act. He seeks to meet the burden of showing that he is deprived "of a constitutional right" by alleging a "summary forfeiture" of property "without due process of law" contrary to the Fourteenth Amendment to the Constitution of the United States and Section 6 of Article I of the Constitution of this State.

The swing of the pendulum presently is to increasing liberality in constitutional construction favorable to validity in legislative action over an ever broadening range. This tendency gives increased emphasis to that presumption of constitutionality, and inclination to recognize the validity of legislative acts in all doubtful cases, which have heretofore influenced this Court, *Lunt's Case*, 6 Me., 412; *Eames* v. *Savage*, 77 Me., 212. Recognition of the presumption has often been made in cases where the challenged act has been declared void, *Props. Kennebec Purchase* v. *Laboree*, 2 Me., 275, 11 Am. Dec., 79;

*Trustees New Gloucester School Fund* v. *Bradbury,* supra; *Bennett* v. *Davis,* 90 Me., 102, 37 A., 864; *State* v. *Butler,* 105 Me., 91, 73 A., 560, 24 L. R. A. (N. S.), 744; *Paine* v. *Savage,* 126 Me., 121, 136 A., 664, 51 A. L. R., 1194. With no thought of yielding to the theory of expediency which underlies the present trend, it seems proper to recognize the present legislation as valid within principles long established.

The statute is designed to facilitate the enforcement of tax liens; to speed the payment, and collection, of taxes; to furnish increased assurance of the regular flow of tax dollars into the coffers of municipal treasuries. From the very beginning of organized government it has been recognized that revenue is essential for its continued existence and taxation has been developed as the just, equal and regular method by which contributions should be exacted from persons and property to meet the expense of government. As Blackwell states in his Tax Titles (Vol. 1, page 16),

> "There must be interwoven in the frame of every government a general power of taxation. . . . A complete power, therefore, to procure a regular and adequate supply of revenue . . ."

In this State, the revenue necessary to maintain local government has been raised, since earliest times, both by poll taxes and by taxes on property, assessed locally under general authorization contained in the public laws or statutes. That this delegation of the taxing power by the legislature is a proper one has never been called in question so long as the constitutional mandate of equal apportionment and assessment has been observed (Section 8 of Article IX and amendment Article XXXVI), and the limitations as to the purposes for which taxes may properly be levied have not been transgressed. The right of the law-making body to provide by general law that the assessment of a tax on real estate creates a lien thereon has never been challenged. The present case does not involve either such issue. Defendant takes his present position, not against

the tax assessment, but against the method of enforcement of the tax lien, and in so doing, seems to recognize the validity of the general laws which delegate the authority to assess the tax and provide for the tax lien.

The law under consideration is challenged on two grounds, the first of which, that "a lien claim is not a mortgage and cannot be made one by legislative fiat," has already been considered in connection with the fourth exception, alleging impropriety in providing for the passage of title to real property without the use of a specialty. The second basis of the challenge is grounded in the well-recognized constitutional requirement of due process. Allegation of the exception is that due process requires

"an opportunity for hearing as to the validity of a statute before private property can be taken by the State, County or City, for taxes."

The challenge is supported by the citation of two cases decided in this Court, two decisions in other jurisdictions, and 12 C. J., 1263. Of the cases cited only one, *Bennett* v. *Davis*, 90 Me., 102, 37 A., 864, dealt with legislation designed to facilitate tax collections by the enforcement of tax liens, and decision there did not hinge on the requirements of due process. The law there passed upon was declared unconstitutional under Sections 6 and 19 of the Declaration of Rights of our State Constitution (Article I), and the Fourteenth Amendment to the Constitution of the United States, as imposing a premium or price on the right to secure relief by legal process in its requirement that one seeking to contest the validity of a tax sale should deposit an amount equal to the tax involved plus interest and costs before beginning, or contesting, any action. The text in 12 C. J., 1263 deals only with special taxes and assessments and not with the collection of such taxes as come within the purview of the Tax Lien Law.

Due process, undoubtedly, as applied to legislation generally involves an opportunity for hearing, and more. This has

been decided on many occasions in this Court, as probably in all courts which operate subject to the supreme authority of the Constitution of the United States. As phrased by Mr. Justice Deasy in *Randall* v. *Patch*, 118 Me., 303, 108 A., 97, 98, 8 A. L. R., 65, wherein the two decisions from other jurisdictions cited in defendant's brief, *Rusk* v. *Thompson*, 170 Mo. App., page 76, 156 S. W., 64, and *Smith* v. *State Board*, 140 Iowa, 66, 117 N. W., 1116, were referred to for support:

"Notice and opportunity for hearing are of the essence of due process of law."

It may be that the particular statement of the point in the exception ignores the generally accepted requirement of notice in recognition of the fact that the statute requires a particular form of notice ten days prior to the filing of the lien certificate and that the statutory form of notice was in fact given to the defendant in this case. Notwithstanding the failure on the part of the defendant to allege a deficiency of notice in the claims asserted before us, we shall seek to show hereafter that the notice required to be, and actually, given was more than sufficient to meet the requirements of due process in the particular field to which the legislation relates. It is very generally recognized both by text writers and decided cases that legislation designed to speed and secure tax collections is a thing apart and that an entirely different and lesser test of due process is to be applied in that limited field as distinguished from other laws of general application.

The issue in tax legislation regularly, as here, relates to the respective rights of a municipality and one of its taxpayers, or to the standing of the property of a taxpayer where there has been a default in the payment of the tax thereon. The immediate issue involves the value to a municipality of the security sought to be provided by the legislature for a small pro rata part of the general tax levy for 1937. The total levy covered the town's proportion of state and county taxes for the year and funds to meet the appropriations made by the qualified

voters. The taxpayer makes no suggestion that any part of the tax assessed to meet the municipal appropriations was for an improper purpose or that the amount levied against his property was in excess of the due proportional part thereof. Defendant had the right to have a judicial review of the valuation placed upon his property, R. S. 1930, Chap. 13, Secs. 73 *et seq.* He had the right, if any part of the levy was assessed for an improper purpose, to pay the tax and recover his payment with twenty-five per cent interest and costs, plus any damages sustained by him, by action at law, R. S. Chap. 14, Sec. 31. These statutory rights would seem to represent full assurance that machinery for the enforcement of tax liens could not operate against his property for more than his due equivalence of taxes or serve to retain any money which was paid by him against an illegal assessment. They seem to serve to meet fully the requirements of due process in the tax field.

In Cooley's Constitutional Limitations, it is stated (7th Edition, page 748; 8th Edition, pages 1103, 1104) that the legislature must have the right to determine what method shall be devised for the collection of taxes "subject only to such rules, limitations and restraints as the constitution of the State may have imposed." "Very summary methods," it is stated, "are sanctioned by practice and precedent" (citing cases). Process not substantially different from that authorized by the present act, except for waiver of the formality of a seal, a reduction in the acts to be performed by the tax authorities, an inconsiderable shortening of the time when forfeiture becomes absolute, and the change from a partial forfeiture to a total one which will be later discussed, has not only been in operation in this State over a long period of years, but has served as the foundation of title to real property after careful scrutiny by the court, *Greene* v. *Lunt*, supra; *Greene* v. *Walker*, supra. Cases almost without number wherein titles claimed under tax deeds have been rejected for failure of strict compliance with each and every statutory requirement carry a clear intimation that full compliance with all statutory requirements would

have vested a good title. (For examples, see cases cited under discussion of sixth exception.)

Chief Justice Appleton rather expressly recognized the validity of the tax sale law in *Inhabitants of Orono* v. *Veazie*, supra, at page 519, a case reported to the full court to determine whether a defendant might contest a writ of entry brought (as was the present suit) to recover possession of a tract claimed to have been acquired under a tax deed. There the issue was whether defendant might contest the suit without payment into court under the then statute, R. S. 1857, Chap. 6, Sec. 145, of an amount equal to the tax, charges and interest. Decision was that the cause should stand for trial notwithstanding default in such deposit, and comment was made,

> "There may be numerous sales and tax deeds. One deed may be valid and the others convey no title."

Such a deed, if valid, could convey no title unless the law which set up the machinery for its execution was in itself valid.

Blackwell in his Tax Titles (page 86) declares that it is within the legislative power to "enact the conditions of sale, and may provide as to the manner of all proceedings" designed to assure the payment and collection of taxes properly assessed against real estate adequately described if the legislation contains provisions for notice to the taxpayer and avoidance of all proceedings on payment of the tax. It is expressly stated, on the basis of many cases analyzed, that the process by which the taxpayer is deprived of his title on non-payment may be summary, and "need not involve any trial by jury nor any judgment."

The position of the text writers, with which the decisions of this Court seem to be in accord, is more than sustained in adjudicated cases in other jurisdictions. In *Newton et al.* v. *Roper et al.,* 150 Ind., 630, 50 N. E., 740, the court said, page 633:

> "The law ... required ... a notice ... that ... taxes were

delinquent, and that a sale would be made. . . . It is true that the notice required to be published was that a public sale would be made, but the plainly written law further provided that a failure to sell . . . should forfeit the property. . . . The notice . . . constructively . . . charged him with notice . . . of the consequences. . . . The notice . . . was sufficient to advise him that his delinquency was subject to the summary remedies of the law."

In *Merchants Trust Co., Exr.* v. *Wright et als.*, 161 Cal., 149, 151, 118 P., 517, 519, it is stated that:

" 'due process of law' . . . consists of the notice provided by law to be given to the delinquent taxpayer. . . . "

In *Maxwell* v. *Page*, 23 N. M., 356, 362, 363, 168 P., 492, 494, 5 A. L. R., 155, the court, after declaring that notice and opportunity for hearing "as to the amount of the charge," i.e., the tax, was the fundamental requirement, quoted with approval the language used in *Smith* v. *Cleveland*, 17 Wis., 556 (Reprint 573, 584):

"The Legislature might have fixed the time and provided for a sale *without notice or advertisement*. They may, surely, by proper legislation in advance, guard against errors and cure mistakes when notice is required." (Italics above ours.)

In *Hagar* v. *Reclamation District No.* 108, 111 U. S., 701, 710, 4 S. Ct., 663, 28 Law Ed., 569, cited on the particular point with approval in *Turpin* v. *Lemon*, 187 U. S., 51, 23 S. Ct., 20, 47 Law Ed., 70, the court after noting that the valuation of property which was to be taxed according to value was a judicial act which in most states (of which Maine is one) provided machinery for the correction of errors stated, page 710:

"The law in prescribing the time when such complaints will be heard, gives all the notice required, and the proceeding by which the valuation is determined, though it

may be followed if the tax be not paid, by a sale of the delinquent's property, is due process of law."

Finally, in *Messer* v. *Lang*, 129 Fla., 546, 556, 176 So., 548, 552, 113 A. L. R., 1073, the court indicates even that the right of redemption is not requisite to a tax enforcement statute by the words:

"The right to redeem at any time is nothing more than a gratuity which may be granted or withheld but if granted, may be restricted in the discretion of the Legislature."

These citations would seem to represent more than ample authority for the principle that the requirements of due process are altogether less strict in the testing of tax legislation than in any other field. The thought which underlies the principle was ably stated long since in this Court in *Roberts* v. *Moulton*, 106 Me., 174, at 176, 76 A., 283:

"Every taxpayer is held to know that if he does not pay the taxes assessed upon his real estate, it will be sold by the collector for non-payment of the tax, at the time and place fixed by statute."

This statement, written in 1909, might be paraphrased now to mean that any delinquent taxpayer who received notice that his taxes on a described parcel of real property were in arrears *and that a lien was claimed thereon* should be held to know that non-payment in ten days would result in the filing of *a tax lien certificate* which, after the expiration of eighteen months from the date of recordation, would forclose his right to redeem the property. Having assented to the amount of the tax by a failure to assert any right to partial abatement, and possessing still a right to recover the tax after payment, if he could show any part of the proceeds assessed for an improper purpose, such a delinquent should not be entitled to hearing before forfeiture of his title.

"The power to tax," says counsel for the defendant, "is the

power to destroy," quoting that greatest of constitutional jurists, John Marshall, fourth Chief Justice of the United States. Recognition of this principle would seem in itself to be sufficient to sustain the law now under consideration since such power would be futile unless it carried full authority to provide adequate machinery for the collection of the taxes imposed. As part of such machinery, our legislation has at all times during our statehood authorized forfeiture of titles to real estate on tax default. At the beginning, this was applicable only to the unimproved lands of non-resident proprietors, P. L. 1821, Chap. CXVI, Sec. 30. Remedy by early law against resident owners was by distraint of goods or chattels, and in default thereof, of the body (Section 26, same chapter). This remedy was available in case of non-payment *on demand*, than which no process could be more summary. Since 1844, we have had tax liens upon real property and the enforcement thereof by tax sales evidenced by tax deeds, R. S. 1930, Chap. 14, Secs. 72 *et seq.*, originally Chap. 123, P. L. 1844. Tax sale machinery was provided as an alternative to enforcement of tax liens by action at law, which defendant insists is the only proper method, since it alone provides "due process," i.e. hearing before a court, R. S. 1930, Chap. 14, Sec. 28. The 1933 law was enacted to provide an additional method—obviously an alternative to the tax sale. Experience had demonstrated that the tax sale method was both too slow and too uncertain to produce efficiently the objective which the legislature had in mind. The over-all period, ignoring minor variations from time to time in the statute and in the effective date because of adjournment of a tax sale from day to day, covered approximately two years and ten months from the tax day to which the assessment related, there being two full years allowed, following the sale, for redemption. Numerous cases, in addition to those already cited on particular points, had demonstrated the uncertainty of tax sale titles, since failure would result from non-compliance with any one of many acts specifically required to be performed by the municipal authorities. Intent of the new statute

obviously was to reduce the number of acts required on the part of such authorities and to shorten the period when forfeiture would become absolute. Comparative measurement of time is apparent if we note that procedure under the tax sale method on the particular tax lien involved in the present case would have vested title in the town not earlier than February 1, 1940, whereas under the act of 1933, such title became absolute, if at all, on August 18, 1939, a saving of between five and six months.

One additional feature of the new remedy remains for consideration, i.e. the abandonment by the Legislature of the long standing policy that a tax lien should be enforced so far, and only so far, as might be necessary to provide sufficient funds for the payment of tax, interest and charges. Our Tax Sale Law, R. S. 1930, Chap. 14, Sec. 72, traces back to a Massachusetts law passed March 16, 1785, in the provision that the sale shall cover so much of the real estate subject to the lien "as is necessary for the payment of said tax, interest and all the charges"; and it does not seem necessary to refer to the decisions of this Court which have interpreted that provision as requiring that the tax collector in making the sale shall sell the smallest *fractional part* of the property taxed necessary for the purpose. The decisions of this Court may be searched in vain for any judicial declaration indicating whether or not the policy so declared is a matter of policy only or was adopted in recognition of a supposed requirement of fundamental law, that the sale of anything more than the minimum interest necessary to serve the purpose would exceed legislative power. In the particular case, no question on this point is raised by the defendant, but notwithstanding that fact, it seems apparent that decision of the cause necessarily involves a determination as to whether the former rule has been grounded in policy or in recognition of fundamental law. We are not aware of any case in any jurisdiction where judicial declaration has intimated that a partial sale rule, either by the sale of a fractional interest in all the property or a sale of something less than all the property, is

constitutionally required. In the Fourth Edition of Cooley's work on Taxation, Vol. III, page 2830, Section 1430, it is stated that:

> ". . . In the absence of any statute limiting the officer's right to sell, to so much as would be requisite to pay the tax and charges, a restriction to this extent would be intended by the law."

This, we believe, must be intended only to indicate that where there is any ambiguity in a statute and doubt exists as to whether or not the legislative intention contemplated a total forfeiture or a partial one, the rule of strict construction against forefeitures will carry an implication that the least burden necessarily carried by the language used shall be imposed upon the taxpayer.

No case is cited by the writer and none has come to the attention of the Court where an undoubted legislative intent for total forfeiture has been held to infringe constitutional limitations. On the contrary, two decided cases in other jurisdictions seem to read quite definitely to the opposite effect. In *Fox* v. *Wright*, 152 Cal., 59, 91 P., 1005, a statute which provided for the sale of property at public auction to the highest bidder was held valid notwithstanding omission to provide that any excess in the sale price, over and above the accrued taxes, charges and penalties, should be paid over to the taxpayer; and the case was tried on a definite claim asserted by the taxpayer that the statute imposed an excessive burden for the support of government in violation of the constitutional mandate requiring uniformity in taxation and compelling an individual to bear only his proportionate share thereof. In the Indiana case, *Newton et al.* v. *Roper, et al.*, supra, the statute under consideration provided definitely that where delinquent lands were offered at public sale and not sold, they should "be considered forfeited to the state."

It should perhaps be noted in this connection that under our own law the tax lien which attaches to property by the mere

assessment of a tax thereon has at all times attached to the full title taxed, and that our legislation, the full history of which has been heretofore traced, has recognized that sale of all that is subject to the lien has been proper if no purchaser appeared at the sale to pay the necessary amount for something less than the entire property. We hold that there is no requirement in the fundamental law, either of this State or of the United States, which prohibits legislative action establishing a policy that the taxpayer shall lose his entire property by failure to pay all taxes properly assessed thereon, provided, as is the fact under the law in question, that adequate provision is made to give the taxpayer opportunity for redemption, and that the language used by the Legislature in the particular act shows that such was clearly the legislative intention.

It has heretofore been noted at the very outset of the consideration given to the sixth exception that in all cases involving property claimed under tax default, the assessment of the tax claimed to have created the lien is the first requisite to the vesting of a valid title. This fundamental is again stressed to call particular attention to the fact that the alternative or additional method for the enforcement of tax liens provided by P. L. 1933, Chap. 244, is not a cure-all for municipal officers. The tax title derived by compliance with its requirements can be no better than the tax assessment on which it is based; and if that assessment is defective, no title can accrue by going through the formality of recording a tax lien certificate. The process is available only as to property properly described and necessarily only if a lien has attached by proper assessment. Notice to the taxpayer is required both by delivery in hand, or at his last and usual place of abode, or by registered mail, and by record in the title registry office, and payment of the tax, with interest and costs, at any time during an eighteen-month waiting period, after record, assures the discharge of the lien. These "proceedings," with the protection afforded to the taxpayer by statute to protect himself against the payment of more than his due equivalence of the total tax levy and to test

the propriety of each and every item in the municipal appropriations, seem to this Court to represent ample protection of all his constitutional rights, and the mandate must be

*Exceptions overruled.*

WORSTER, J., does not concur.